973 So.2d 83 (2007)
STATE of Louisiana
v.
Justin TAYLOR.
No. 07-KA-93.
Court of Appeal of Louisiana, Fifth Circuit.
November 27, 2007.
*86 Paul D. Connick, Jr., District Attorney, Twenty-Fourth. Judicial District Parish of Jefferson, Terry M. Boudreaux, Andrea F. Long, Donald A. Rowan, Jr., Assistant District Attorneys, Gretna, LA, for Plaintiff/Appellee.
Jane L. Beebe, Attorney at Law, Louisiana Appellate Project, New Orleans, LA, for Defendant/Appellant.
Panel composed of Judges EDWARD A. DUFRESNE, JR., THOMAS F. DALEY and WALTER J. ROTHSCHILD.
WALTER J. ROTHSCHILD, Judge.
On February 20, 2003, defendant, Justin Taylor, was charged by grand jury *87 indictment with second degree murder, a violation of LSA-R.S. 14:30.1. He pled not guilty at arraignment. Defendant was tried by a twelve-member jury on March 21, 22, and 23, 2006, and the jury returned a verdict of guilty as charged. On April 27, 2006, the trial court sentenced defendant to life imprisonment at hard labor without benefit of parole, probation, or suspension of sentence. The court ordered that the sentence run consecutively to any other sentence defendant was serving. Defendant filed a motion for appeal, which was granted by the trial court.
FACTS
Officer Keith Seals of the Kenner Police Department testified that on the night of December 26, 2001, he was on patrol when he responded to a shooting call at the Burger King Restaurant at 1000 West Esplanade. When he arrived at the scene, he saw a restaurant manager, Benny Randazzo, lying dead on the floor. Some restaurant employees were sitting in the dining area, and they appeared to be in shock.
Officer Seals interviewed employee Lenell Jackson. Ms. Jackson said she was standing behind the service counter when the shooting occurred. She described the gunman as 5 feet, 11 inches tall, wearing a gray, hooded sweatshirt and blue jeans. A black bandanna covered the lower part of his face. The other employees gave the officer similar descriptions. Ms. Jackson said that when the perpetrator entered the restaurant, he ordered that no one move, and he told the victim to open all of the cash registers.
Judy Jacobsen testified that at the time of the murder, she was the manager of the Burger King on West Esplanade. The victim, Mr. Randazzo, was an assistant manager, and he was also married to Jacobsen's sister. Jacobsen testified that she worked the day shift on the date of the murder and Randazzo ran the evening shift. Jacobsen remained at the restaurant for some time after her shift ended in order to balance the employees' cash register receipts and lock the money in the safe. During that time, Randazzo was working in the front of the restaurant.
Jacobsen testified that employee Eddie Jackson was working as a cashier that evening. When Jacobsen returned to the front of the restaurant after counting receipts, she saw that Eddie's sister, a newly hired employee, was sitting at a table in the dining area. The young woman was eating a Whopper Jr. meal while she waited for Randazzo to assist her with some new hire paperwork. Jacobsen testified that there had been a major problem at the restaurant with employees serving food to people who had not paid for it. When Jacobsen saw that Eddie's sister did not have a sales receipt on her meal tray, she suspected the girl had not paid for the food. Jacobsen testified that she checked the recent cash register receipts, but did not find one for the sale of a Whopper Jr. meal. While Jacobsen was checking the registers for the sale, Eddie was working in the drive-through area. Jacobsen testified that she was pretty sure he knew what she was looking for, because it was coinmon knowledge that anyone who gave out food without collecting payment for it could lose his or her job.
Jacobsen asked Randazzo to take Eddie and his sister aside and inform them that he was being fired and she would not be hired, and to tell them why. According to Jacobsen, Randazzo was short on staff, so he did not fire Eddie that night. At 7:00 p.m., Randazzo instructed Eddie to take a 30-minute break. When Jacobsen called Randazzo at 9:00 that night, he told her that he had not fired Eddie, and that Eddie had gone on break and failed to return. Neither Jacobsen nor Randazzo *88 confronted Eddie that day about giving away food.
Jacobsen testified that police called her at 11:00 that night to inform her that Randazzo had been shot and killed at the restaurant. She was asked to inform her sister, Randazzo's wife, of his death. Jacobsen and her husband went to the restaurant with her sister and nephew. Jacobsen spoke to a detective, who asked her if there had been any incidents at the restaurant that might have provoked the shooting. She informed him of the incident involving Eddie Jackson.
Detective Michael Cunningham testified that he reported to the scene 15-20 minutes after the shooting. After conferring with Officer Seals, Cunningham sent four witnesses to the Kenner police complex, where he later interviewed them. Those witnesses were Burger King employees Jessica White, Ernest Brown, Donnie McCoy, and Lenell Jackson.[1] Detective Cunningham testified that the witnesses described the shooter as a black man. There were some discrepancies in the witnesses' descriptions, but all of them, except Donnie McCoy, said the perpetrator wore a gray, hooded sweatshirt. McCoy reported that he was cleaning the bathroom at the time of the shooting and did not see the perpetrator. The witnesses also said the gunman wore a dark colored bandanna, and that his gun was a chrome-plated or silver revolver.
Cunningham also questioned Burger King employee David Reese, who left the restaurant on his bicycle minutes before the murder. Reese told Cunningham he saw two men in the Burger King parking lot when he left the restaurant. At first he named fellow employee Eddie Jackson as one of the men, but later said he was not sure if the man was Jackson.
Cunningham testified that Jacobsen informed him the victim was supposed to fire Eddie Jackson. He learned that Eddie Jackson lived two doors down from Ernest Brown. Based on that fact, the detective interviewed Brown a second time. When Cunningham interviewed Brown a third time in late 2002, Brown was in jail on armed robbery charges unrelated to the murder. Brown stated that defendant was the gunman in the murder, and that he recognized defendant by his voice.
Detective Cunningham also learned that Eddie Jackson is defendant Justin Taylor's nephew. At the time of the murder, defendant, lived one block away from Eddie. On December 27, 2001, Cunningham interviewed Eddie, who was wearing a gray hooded sweatshirt and gray sweatpants. Eddie told the detective that on the day of the murder, he walked to defendant's house shortly after 11:00 a.m. At about 3:30 p.m., Eddie and defendant walked to Eddie's house. They saw Ernest Brown along the way and talked to him. Eddie then went home to change clothes, and he and his sister went to Burger King. They left Burger King at 5:00 p.m. Eddie went home and babysat for his little brother. Then, at 8:00 p.m. he picked up defendant, and they went to an EZ Serve store, and then to a Popeye's restaurant at Williams Boulevard and West Esplanade. After that, the two men went to defendant's house, where Eddie stayed until midnight.
Detective Cunningham testified that officers obtained a security videotape from an EZ Serve located a quarter of a mile from the Burger King. Still photographs from that videotape were introduced as evidence and Cunningham identified them. *89 The detective testified that the photographs depicted defendant and Eddie Jackson in the EZ Serve store 20 minutes after the murder, and both were wearing gray hooded sweatshirts. Based on what he saw on the security video, Cunningham compiled a photographic lineup that included a picture of Eddie Jackson and a second lineup that included defendant.
Detective Cunningham executed a search warrant at Eddie Jackson's house on May 21, 2002, where he recovered, among other things, a gray hooded sweatshirt. Cunningham also executed a search warrant at the home of Lashira Jackson, defendant's niece and Eddie Jackson's sister. At her house, officers recovered a .38 Special chrome revolver with a brown wooden handle. The parties stipulated that Cunningham found the gun in Lashira Jackson's house on June 10, 2002, and defendant admitted to Cunningham that he had put the gun there.
At trial, Ernest Brown testified that he knew both defendant and Eddie Jackson prior to the murder. Both men lived in his neighborhood. At the time of the shooting, Brown was at the front service counter talking to a fellow employee. Randazzo was in the dining area preparing to close the restaurant for the night. A man walked in, pointed a gun toward the cash register, and said, "Open the register," The gunman then pointed his weapon at Randazzo and told him to open the cash register. When Randazzo moved to hand the perpetrator the keys, the man shot him in the head. Brown testified that he is positive defendant was the shooter. He could not identify defendant by his face, but recognized his voice.
Ashley Smith testified that Burger King employee Donnie McCoy is the father of her sister's child. On the night of the murder, while McCoy was working, Smith and her sister drove to the restaurant to bring him cigarettes. Smith sat in the car in the parking lot while her sister went inside. While she was waiting, Smith saw two men walk toward the restaurant and then go behind the building to the durnpster area. She testified she was there for 15-20 minutes, but did not see the men exit the area.
Smith testified that when she learned about the murder at Burger King, she told police about the men she had seen. Detective Cunningham testified that Smith said one of the men wore a gray hooded sweatshirt. On January 2, 2002, Cunningham showed Smith a photographic lineup that included a picture of Eddie Jackson, but Smith did not identify anyone from that lineup. Cunningham also showed Smith a lineup with defendant's photograph. She picked out defendant's picture, along with one other, and told the detective that one of her two selections was one of the men she had seen in the parking lot. Smith testified that she recognized defendant as one of the men she had seen before the murder, but she picked an extra photograph because she was afraid to identify the perpetrator.
After Smith viewed the photographic lineup, she took McCoy to Burger King to pick up his cheek and saw the two men that she, had seen on the night of the murder. One of them was named Eddie, and the other was wearing a gray sweatshirt that she recognized from the night of the murder. She went back to the police station and told Cunningham she could positively identify defendant as one of the men she had seen before the murder. She also identified defendant in court.
Roxanne Molinary testified that she was working at a CC's Coffee Shop across the parking lot from Burger King on the night of the murder. Fifteen minutes before she closed the shop for the night, Molinary saw two young men approach the Burger *90 King drive-through window on foot. One of the men was wearing a gray sweatshirt with the hood pulled up and dark pants. The other was wearing a dark jacket and light colored pants. When CC's closed at 10:00 p.m., Molinary began performing cleanup duties. She took some garbage outside and saw two young men dressed like the ones she had seen earlier, running through the parking lot. Five to six minutes later, police arrived at Burger King. Molinary testified she could not see the men's faces. Police showed her photographic lineups, but she was unable to make an identification.
Andrea Andrews testified that at 10:00 p.m. on December 26, 2001, she was shopping at the Sav-A-Center store adjacent to the Burger King. She saw a man talking on a cellular telephone. The man left the store at the same time Andrews did, and he met a second man at the front entrance. While Andrews was putting her purchases in her car, the two men walked past her, heading directly toward Burger King. One of them had a bandanna around his neck. Andrews thought they looked suspicious. Andrews stopped briefly at a nearby drug store. When she exited the store, several police vehicles were heading toward Burger King.
Andrews came forward as a witness when she saw news reports about the case. When Cunningham showed Andrews a photographic lineup, she identified defendant as the man she had seen waiting at the Say-A-Center entrance. She wrote on the back of the lineup that she was 75% certain of her choice.
DISCUSSION
On appeal, defendant sets forth eight assignments of error. In his first assignment of error, defendant contends that the trial judge erred in failing to recuse himself from this case. The State responds that the motion to recuse was properly denied, because the record shows no bias or prejudice on the judge's part.
On December 7, 2004, defendant filed a motion to recuse Judge Hans Liljeberg based on his acquaintance with the murder victim, and because the judge had witnessed an incident in which defendant physically attacked his court-appointed counsel in open court. The trial court took up defendant's motion to recuse on December 15, 2004. Judge Liljeberg explained he had been recently reminded that he had attended high school with the murder victim, Benny Randazzo. The judge recalled that Randazzo was a couple of years behind him in school, he did not know him well, and he had not seen him since high school.
Defense counsel then raised the issue of defendant's physical altercation with his previous attorney in court on November 30, 2004. The minute entry for that day shows the case was set for trial, and the parties were in the courtroom. Defendant physically attacked his attorney, William Doyle. The trial was continued, and the court appointed another attorney to represent defendant.
Defense counsel argued the attack could result in criminal charges and because Judge Liljeberg was present during the altercation, he could be called to testify against defendant. Judge Liljeberg declined to recuse himself. The judge stated, "[I]f I thought that I was biased or prejudice [sic], I would honestly recuse myself. . . . I can give Mr. Taylor a fair trial." Judge Liljeberg ordered that the recusal motion be randomly allotted to another judge for a contradictory hearing.
A hearing on defendant's motion was held on January 6, 2005 before Judge Greg Guidry. During his testimony, Judge Liljeberg stated that the court was preparing for defendant's trial on November 30, *91 2004, and the parties were in the courtroom waiting for the jury venire. Defendant, who was unshackled, had asked the judge to appoint him new counsel, as he was dissatisfied with his attorney, Mr. Doyle. He also moved for a continuance. The judge denied both requests. Defendant began chasing Mr. Doyle around the courtroom. Doyle fell, and defendant jumped on him and began hitting him. The jailers and the court's bailiff broke up the fight. Judge Liljeberg testified that no one from the sheriff's office or the district attorney's office had questioned him about the incident.
On cross-examination by the State, the judge testified that he was not a witness in defendant's murder case. When the prosecutor asked whether the judge and Randazzo had been acquaintances, and the judge responded, "I wouldn't even say that." When asked whether having attended high school with the victim would cause him to be biased or prejudiced against defendant, the judge said, "Absolutely not."
After hearing arguments from counsel, Judge Guidry denied the recusal motion. finding that the evidence presented was insufficient "to establish that the Judge would be biased, prejudiced or personally interested to such an extent that he would be unable to conduct a fair and impartial trial." Defendant applied for supervisory writs to this Court, but his writ application was denied on April 22, 2005. The Louisiana Supreme Court denied writs as well. State v. Taylor, 05-1227 (La.5/18/05), 902 So.2d 1034. Defendant filed a second motion to recuse in the trial court on June 10, 2005, making essentially the same claims he made in his first motion, but Judge Liljeberg denied that motion on June 16, 2005.
LSA-C.Cr.P. art. 671 specifies the grounds upon which a judge may be recused in a criminal case. The pertinent subparts of that article provide:
A. In a criminal case a judge of any court, trial or appellate, shall be recused when he:
(1) Is biased, prejudiced, or personally interested in, the cause to such an extent that he would be unable to conduct a fair and impartial trial;
. . . .
(6) Would be unable, for any other reason, to conduct a fair and impartial trial.
Canon 2B of the Louisiana Code of Judicial Conduct provides, in pertinent part, that "[a] judge shall not allow family, social, political, or other relationships to influence judicial conduct or judgment." Canon 3C of that code provides:
Recusation. A judge should disqualify, himself or herself in a proceeding in which the judge's impartiality might reasonably be questioned and shall disqualify himself or herself in a proceeding in which disqualification is required by law or applicable Supreme Court rule. In all other instances, a judge should not recuse himself or herself.
A trial judge is presumed to be impartial, and the burden is on the party seeking to recuse a judge to prove otherwise. State v. Strickland, 04-843, p. 11 (La.App. 5 Cir. 3/1/05), 900 So.2d 885, 893, writ denied, 05-0820 (La.6/17/05), 904 So.2d 683. The grounds for recusal based on bias or prejudice must amount to more than conclusory allegations. State v. Galliano, 05-962, p. 41 (La.App. 5 Cir. 8/29/06), 945 So.2d 701, 727-28, writ denied, 06-2367 (La.4/27/07), 955 So.2d 682.
In the present case, defendant has, failed to meet his burden of proving bias or prejudice of the judge, or even the appearance of impropriety. Defendant's argument consists of unsupported, conclusory *92 allegations. There was no real social connection between Judge Liljeberg and Mr. Randazzo. The judge testified he barely knew the victim, and that he had not seen him since high school. As to the fact that the judge was a potential witness against defendant, the judge testified that it would have absolutely no influence on his ability to impartially preside over the murder case. Further, although LSA-C.E. art. 605 provides, "[t]he judge presiding at the trial may not testify in that trial as a witness," Judge Liljeberg was not a witness against defendant in the murder prosecution. Moreover, without a specific showing of bias or prejudice, the fact that a defendant behaved improperly in the judge's presence is not sufficient grounds for recusal.
Defendant has not pointed to any evidence in the trial record that demonstrates the trial judge was biased or prejudiced against defendant. Thus, we find no error in the denial of defendant's motion to recuse, and this assignment of error is without merit.
In his second assignment of error, defendant asserts that "[t]he state violated Brady/Giglio by failing to disclose evidence regarding state witness Ernest Brown." First, he contends that his conviction should be reversed, because the State failed to timely disclose exculpatory evidence regarding the plea deal Ernest Brown received in exchange for his testimony. Second, he argues that the State failed to turn over Ernest Brown's grand jury testimony, which he could have used to impeach Brown's trial testimony. Lastly, defendant complains that the State violated the dictates of Brady[2] and Giglio[3] by failing to timely notify him that it had placed Brown under a material witness bond.
On February 27, 2003, defendant filed omnibus pre-trial motions, including a "Motion to Require the State to Disclose All Evidence Favorable to Defendant," in which he specifically requested all Brady material. On May 23, 2005, defendant filed a "Motion to Reveal the Deal," asking that the State be compelled to disclose any deals it had entered into with witnesses in order to secure their testimony at trial. On May 26, 2005, defendant filed a "Second Motion to Require the Prosecution to Disclose Evidence Favorable to Defendant Pursuant to Brady v. Maryland and Kyles v. Whitley." On May 27, 2005, defendant filed a "Motion for Court to Conduct in-Camera Inspection of Grand Jury Testimony," in which he asked the trial court to review the transcript of the grand jury proceedings for any exculpatory information, particularly the grand jury testimony of Ernest Brown.
The trial court took up several motions on June 1, 2005. The State agreed to submit the grand jury transcript to the judge for in camera inspection. The court granted the Motion to Reveal the Deal and the Brady motion.
On June 16, 2005, defendant filed a "Motion for State to Turn Over Ernest Brown's File." On that day, the trial court ruled that the State would not be required to turn over Brown's entire file, but the State was to inform the defense if a deal was made and, if so, what it consisted of. On that day, the prosecution gave the judge a transcript of Ernest Brown's grand jury testimony for in camera inspection.
On March 21, 2006, before the trial testimony began, the defense raised what it claimed was a Brady/Giglio violation by the State. Defendant complained that the *93 State had not timely notified him that it had filed a material witness hold as to Ernest Brown. This issue was addressed again on March 22, 2006, and the trial court found no Brady or Giglio violation, stating, "It's not Giglio unless [the witness] says, you know, they're not letting me out of jail until I testify there [sic] way. In my opinion, that is the only way it becomes Giglio."
In Brady v. Maryland, 373 U.S. 83, 87, 83 S.Ct. 1194, 1196-1197, 10 L.Ed.2d 215 (1963), the United States Supreme Court held that the suppression by the State of evidence favorable to the accused after it receives a request for, it violates a defendant's due process rights where the evidence is material to either guilt or punishment, without regard to the good or bad faith of the prosecutors. See also State v. Bright, 02-2793, pp. 5-6 (La.5/25/04), 875 So.2d 37, 41-42. Evidence is "material" under Brady only if there is a reasonable probability that the result of the proceeding would have been different if the evidence had been disclosed to the defense. A reasonable probability is one that is sufficient to undermine confidence in the outcome. United States v. Bagley, 473 U.S. 667, 682, 105 S.Ct. 3375, 3383, 87 L.Ed.2d 481 (1985). A reviewing court determining materiality must ascertain "not whether the defendant would more likely than not have received a different verdict with the evidence, but whether in its absence he received a fair trial, understood as a trial resulting in a verdict worthy of confidence." Kyles v. Whitley, 514 U.S. 419, 434, 115 S.Ct. 1555, 1566, 131 L.Ed.2d 490 (1995). The Louisiana Supreme Court has held that late disclosure as well as non-disclosure of exculpatory evidence may deprive the defendant of a fair trial. State v. Kemp, 00-2228, p. 7 (La.10/15/02), 828 So.2d 540, 545; State v. Williams, 448 So.2d 659, 665 (La.1984).
Turning to Ernest Brown's plea agreement with the State, the record shows the defense was fully informed of its provisions prior to trial. At the motion hearing on June 1, 2005, defense counsel, Mr. Faulkner, informed the court:
We have had the opportunity to review the records of Mr. Brown, specifically his plea bargain, wherein the State agreed to dismiss various charges against Mr. Brown. They also agreed not to multiple bill Mr. Brown on various previous armed robbery and conspiracies to commit armed robberies in conjunction for his truthful testimony in the Grand Jury proceedings against Mr. Taylor. We are requesting that the State reveal any other deals that they have with Mr. Brown that are in connection with this particular case or any other witnesses that they may have offered any deals to in connection with testifying in this particular case.
Assistant district attorney Jacqueline Maloney responded:
That will be done. I just want to say for the record, though, that I've met with Mr. Brown on several occasions, and I have neither offered him anything or made any deals with him myself. However, I do understand I represent the State, and Doug Freeze [sic] handled Mr. Brown's case previous to my becoming involved in it. So I will check with them and see if there is anything other than what is mentioned in the minute entry exists between the State and Mr. Brown.
The defense then introduced a certified copy of Ernest Brown's commitment in district court case number 02-6176 and a certified copy of the guilty plea/waiver of rights form from that case. That exchange and defense counsel's production of the documentation of Ernest Brown's prior guilty plea show that the defense had *94 knowledge of the factors involved in Brown's plea agreement.
At trial, the defense called attorney Doug Freese as a witness. Freese testified that as an assistant district attorney, he had handled Ernest Brown's armed robbery prosecution. Freese testified that during that prosecution, he learned that Brown had information about the Justin Taylor murder case, so he offered Brown a deal in return for his truthful testimony at the murder trial. If Brown did not testify truthfully, he would face a multiple bill. Freese testified that Brown pled guilty to a reduced charge of conspiracy to commit armed robbery, and received a six-year sentence. The plea deal was worked out prior to Brown's grand jury testimony.
Also at trial, defense counsel thoroughly cross-examined Brown regarding his plea deal with the State. Brown testified he was initially charged in six counts with armed robbery, conspiracy to commit armed robbery, and attempted armed robbery. His attorney told him he was facing life imprisonment. When he pled guilty, five of the six charges were dismissed, and the State agreed not to file a multiple bill. Brown understood that in exchange he was to testify against defendant in this murder case.
The accounts of the plea agreement given by Freese and Brown show there was nothing more to Brown's plea agreement than what the defense knew as of June 1, 2005, nearly a year before defendant's trial. Thus, we find that defendant has not shown that the State withheld or failed to timely disclose exculpatory information regarding the State's promise of leniency to Ernest Brown.
Defendant's next argument pertains to Brown's grand jury testimony. As a general matter, a defendant is not entitled to production of a transcript of a secret grand jury proceeding, even for use in conducting cross-examination at trial. LSA-C.Cr.P. art. 434; State v. Higgins, 03-1980, p. 35 (La.4/1/05), 898 So.2d 1219, 1241, cert. denied, 546 U.S. 883, 126 S.Ct. 182, 163 L.Ed.2d 187 (2005). This is to encourage full disclosure of information concerning a crime. Id. However, there is an exception to this rule where the grand jury record contains evidence favorable to the accused that is material to guilt or innocence. Higgins, 03-1980 at p. 36, 898 So.2d at 1241. The trial court may, based upon a specific request stated with particularity, review the grand jury transcripts in camera to determine whether any such material is contained therein. Id.
On June 16, 2005, the prosecution filed a "Memorandum to the Court Regarding Defense Request for Grand Jury Transcript and Motion to Place Grand Jury Transcript Under Seal." In the memorandum, the, State attested that it was turning over the grand jury transcripts to the court for in camera inspection, as requested by defendant. In an Order issued on June 20, 2005, the trial judge delineated the portions of the grand jury transcript that he considered to be discoverable by the defense. The judge ordered that the listed portions of the transcript be turned over to defendant. The order further provided that "[c]ounsel for the State and Defendant should contact the Court to obtain copies of the discoverable portion of the grand jury testimony."
The trial court complied with defendant's request for an in camera inspection of Mr. Brown's grand jury testimony, and found portions of it to be discoverable. Although defendant claims that the grand jury testimony was not given to the defense, it is clear from the trial court's order that the exculpatory portions of the *95 grand jury transcript were made available to the defense well in advance of trial. Defendant cannot now complain that the State withheld those materials.
Further, there is no merit to defendant's argument that he was prejudiced by the prosecution's failure to notify him until just prior to the start of trial that the State had filed a material witness bond as to Ernest Brown. It is true that Brown's testimony was important to the State's case. Brown was the only eyewitness to the shooting who positively identified defendant as the shooter. Nevertheless, the fact that the State had filed a material witness bond was not relevant to defendant's guilt. The prosecutor noted that prior to defendant's trial, Brown was in prison on charges unrelated to this case, and there was no question that he would be "available" to testify. Brown was not forced to testify in the manner the State desired in order to avoid incarceration on the material witness warrant, because he was already incarcerated. Brown testified as part of a plea agreement with the State, and that fact was revealed to the jury. In any case, the defense learned about the material witness bond before trial began, which was enough time to allow defendant to present this information to the jury.
Based on the foregoing, we find no merit in defendant's argument that the State violated. Brady or Giglio by failing to disclose evidence regarding Ernest Brown. Accordingly, defendant's second assignment of error is without merit.
In his third assignment of error, defendant argues that the trial court erred in denying his mistrial motion, because the State violated the discovery rules by failing to disclose a statement made by State witness Roxanne Molinary.
Defendant filed a pre-trial "Motion for Discovery of Prior Statements of Witnesses," in which he requested all statements made by State witnesses to police or prosecutors that contained Brady material. Additionally, the parties agreed to openfile discovery. At trial, Ms. Molinary testified that she was working at a coffee shop across from the Burger King just prior to the murder when she saw two young men approach the restaurant's drive-through window on foot. Shortly thereafter, she saw the same two men running away from Burger King. Five minutes later, she saw police arrive at Burger King. Molinary testified that one of the men wore a gray sweatshirt with the hood pulled up and dark pants, and the other wore a dark jacket and light colored pants. Molinary viewed photographic lineups, but was unable to make an identification.
Molinary testified that she gave a statement to police in December of 2001, but neglected to tell the officer she had seen the men at the drive-through window. At trial, when the prosecutor asked why she had left that information out of her statement, Molinary said, "I'm not sure. Because I as [sic] startled or nervous." Defense counsel voiced an objection out of the jury's hearing. He asked that Molinary's testimony about seeing the two men at the drive-through window be stricken, since the defense had not received that information in discovery. Counsel asserted that the prosecutor "apparently met with the lady, got the information and has not turned it over to us." The prosecutor responded:
She told me when we met that she saw two people at the drive thru window, and I questioned her about it the first time she brought it up. It's not Brady. It wasn't in the statement, and until she said it just now that she was a hundred percent, I didn't know that she was a hundred percent sure that it was *96 the same two people. That's why I asked the question.
The trial judge overruled defendant's objection, stating that the evidence did not fall under Brady. Defense counsel argued he was granted open-file discovery, but now believed he had not received everything to which he was entitled. The prosecutor responded that she did not know about the drive-through testimony prior to trial. Defense counsel moved for a mistrial, but the motion was denied.
The rules of discovery are in tended to eliminate unwarranted prejudice arising from surprise testimony and to allow the defense to properly assess the strength of the State's evidence in preparing its case. State v. Harris, 00-3459, p. 8 (La.2/26/02), 812 So.2d 612, 617. When the defendant is lulled into a misapprehension as to the strength of the State's case, basic unfairness may result. Id. Mistrial is only one of the remedies available to the trial court in redressing a discovery violation, and it is warranted only when an error results in substantial prejudice to the defendant. Id. at 9, 812 So.2d at 617.
In the instant case, the statement by Ms. Molinary was not something the State was required to disclose to the defense under the rules of discovery: It was clearly not Brady evidence. If anything, it was inculpatory. Furthermore, the prosecutor informed the court that Ms. Molinary had not told her before trial that she was sure it was the same two men at the drive-through window. The State has no obligation to disclose information it does not possess. State v. McGinnis, 04-1286, p. 22 (La.App. 5 Cir. 10/6/05), 917 So.2d 471, 485, writ denied, 05-2469 (La.4/28/06), 927 So.2d 283.
The record does not reveal that klefendant was lulled into a misapprehension of the strength of the State's case because he did not know about everything Ms. Molinary would say at trial. Defendant argues that the non-disclosure of a portion of Molinary's testimony prejudiced him because it had to do with identification, a crucial issue at trial. However, Ms. Molinary was not an eyewitness to the murder, and she was unable to positively identify anyone either before or during trial. We find no violation of the discovery rules by the State regarding Ms. Molinary's testimony. Thus, this assignment of error is without merit.
In his fourth assignment of error, defendant asserts that the trial court erred in limiting his voir dire questioning with respect to witness misidentification. He argues that the judge's ruling deprived him of the ability to reasonably explore potential jurors' prejudices and predispositions. The State maintains that the trial court did not abuse its broad discretion, and defendant was not prejudiced by the ruling, since he was otherwise allowed wide latitude in conducting voir dire.
The ruling of which defendant complains came well into the voir dire proceedings, after ten jurors had been seated. Defense counsel questioned members of the venire panel about the factors they would consider important in judging whether a witness' identification was accurate. Counsel asked whether any of them had heard about the Clyde Charles case in Terrebonne Parish. He began to explain that Charles was convicted of aggravated rape after being identified at trial by the victim. The State objected, arguing that counsel could not discuss a specific instance of misidentification that had occurred in another case.
The trial court sustained the State's objection, saying, "I don't want to talk about casesI mean you can ask them everything about misidentification, do you think it happens; do you think people go to prisonyou can ask them all of that, *97 yeah." The court noted defense counsel's objection, and the voir dire continued.
Article I, § 17A of the Louisiana Constitution grants a criminal defendant the right to a full and complete voir dire. The purpose of voir dire is to give counsel the opportunity to determine the qualifications of prospective jurors by testing their competency and impartiality, and to formulate reasons for cause and peremptory challenges. State v. Ball, 00-2277, p. 23 (La.1/25/02), 824 So.2d 1089, 1110, cert. denied, 537 U.S. 864, 123 S.Ct. 260, 154 L.Ed.2d 107 (2002). The trial court is granted broad discretion in regulating the conduct of voir dire, and his rulings will not be disturbed on appeal absent a clear showing of an abuse of discretion. LSA-C.Cr.P. art. 786; Ball 00-2277 at 23, 824 So.2d at 1110. In evaluating the fairness of the trial judge's ruling, the entire voir dire examination should be considered. State v. Housley, 05-502, p. 5 (La.App. 5 Cir. 1/31/06), 922 So.2d 659, 662, writ denied, 06-1183 (La.11/17/06), 942 So.2d 531.
After reviewing the transcript of the voir dire proceedings, we find that defendant has failed to show that the trial judge abused his discretion by not allowing defense counsel to discuss specific cases of misidentification. Defense counsel did not begin the line of questioning at issue until most of the jurors had been selected. Thus, the judge's ruling had little, if any, impact on defendant's selection of jurors. Moreover, a reading of the voir dire as a whole shows it was conducted fairly and that defendant was not deprived of the opportunity to determine the qualifications of the jurors. Accordingly, this assignment of error is without merit.
In his fifth assignment of error, defendant contendq that the trial court erred in admitting hearsay evidence through the testimony of police officers. He complains he was denied his right of confrontation when the trial court allowed the State to elicit hearsay testimony from Officer Seals and Detective Cunningham over his objections. The State respond that the officers' testimony did not constitute hearsay, since it was admitted to show why the officers took the actions they did to identify a suspect.
The Sixth Amendment to the United. States Constitution guarantees an accused in a criminal prosecution the right to be confronted with the witnesses against him. Similarly, the confrontation clause of the Louisiana Constitution expressly guarantees the accused the right "to confront and cross-examine the witnesses against him." LSA-Const. art. I, § 16; State v. Weaver, 05-169, p. 13 (La. App. 5 Cir. 11/29/05), 917 So.2d 600, 609, writ denied, 06-0695 (La.12/15/06), 944 So.2d 1277. The primary purpose of confrontation rights is to secure for the defendant the opportunity of cross-examination. Id.
Hearsay is an oral or written assertion, other than one made by the declarant while testifying at the present trial or hearing, offered in evidence to prove the truth of the matter asserted. LSA-C.E. art. 801 C. Hearsay evidence is not admissible except as otherwise provided by the Code of Evidence or other legislation. LSA-C.E. art. 802; State v. Leonard, 05-42, p. 14 (La.App. 5 Cir. 7/26/05), 910 So.2d 977, 986, writ denied, 06-2241 (La.6/1/07), 957 So.2d 165.
Officer Keith Seals, one of the first police officers to arrive at the murder scene, testified that he spoke to Lenell Jackson, a witness to the shooting. Seals said he was told that the shooter wore a gray, hooded sweatshirt and blue jeans. At that point, defense counsel objected to the testimony on hearsay grounds. The prosecutor *98 responded that witnesses' descriptions are considered non-hearsay under LSC.E. art. 801 D(1), which provides that a statement is not considered hearsay if "[Me declarant testifies at the trial or hearing and is subject to cross-examination concerning the statement, and the statement is: . . . [o]ne of identification of a person made after perceiving the person."
The trial court overruled the objection, and allowed the State to elicit further testimony from Seals about what the perpetrator looked liked. Defendant made another hearsay objection, which the court overruled. The judge noted defense counsel's continuing objection. Seals then testified that he spoke to the other Burger King employees who had witnessed the murder, and that they essentially repeated what Ms. Jackson had told him.
Detective Cunningham testified that he interviewed witnesses Jessica White, Ernest Brown, Donnie McCoy, and Lenell Jackson. When the detective began to testify regarding Ernest Brown's description of the shooter, defense counsel made a hearsay objection. The court overruled the objection, reasoning the testimony was not hearsay because the State was not using it to prove the truth of the Matter asserted, but to show why the officer acted as he did in his efforts to arrive at a suspect in the murder case. When Cunningham testified to what the restaurant's manager, Judy Jacobsen, told him, the defense made another hearsay objection. The trial court overruled the objection because Jacobsen had already testified at trial and was subject to cross-examination. The State went on to elicit testimony from Cunningham about what he was told by defendant's nephew, Eddie Jackson; Burger King employee, David Reese; Lenell Jackson, Ashley Smith, and Andrea Andrews.
A police officer, in explaining his own actions, may refer to statements made to him by other persons involved in the case. State v. Dyer, 00-1866, p. 14 (La. App. 5 Cir. 4/24/01), 794 So.2d 1, 12, writ denied, 01-1579 (La.6/27/03), 847 So.2d 1256. Such statements are admitted not to prove the truth of the matter asserted, but to explain the sequence of events leading to the arrest of the defendant from the viewpoint of the officer. Id. In State v. Broadway, 96-2659, pp. 7-8 (La.10/19/99), 753 So.2d 801, 808, cert. denied, 529 U.S. 1056, 120 S.Ct. 1562, 146 L.Ed.2d 466 (2000), the Louisiana Supreme Court commented on the admissibility of information received by a police officer:
When an out-of-court statement, such as information received by a police officer during an investigation of a crime, has both an impermissible hearsay aspect and a permissible nonhearsay aspect, the issue of relevancy becomes significantly interrelated with the hearsay issue. If the nonhearsay content of the statement has little or no relevance, then the statement should generally be excluded on both relevance and hearsay grounds. Marginally relevant nonhearsay evidence should not be used as a vehicle to permit the introduction of highly relevant and highly prejudicial hearsay evidence which consists of the substance of an out-of-court assertion that was not made under oath and is not subject to cross-examination at trial.
In the present case, much of the testimony at issue was clearly admissible. The officers' testimony about what they were told by witnesses Ernest Brown, Ashley Smith, Andrea Andrews, and Judy Jacobsen was not, hearsay, because those declarants testified at trial and were subject to cross-examination.
*99 David Reese, Lenell Jackson, and Eddie Jackson did not testify at trial; and none of them were ever subject to cross-examination by defendant. However, our review reveals that much of the officers' testimony regarding these witnesses' statements was admissible to show how the officers came to arrest defendant and charge him with Benny Randazzo's murder. Although some of the testimony constituted inadmissible hearsay, the error in allowing this testimony was harmless.[4] Defense counsel extensively cross-examined Officer Seals and Detective Cunningham, and he had the officers repeat much of the same testimony the State elicited. See State v. Cho, 02-274, p. 18 (La.App. 5 Cir. 10/29/02), 831 So.2d 433, 447-48, writ denied, 02-2874 (La.4/4/03), 840 So.2d 1213. He cannot now complain that such testimony is inadmissible. Moreover, there was considerable other evidence to support defendant's conviction, and the guilty verdict was surely unattributable to any error in allowing this testimony. Accordingly, this assignment of error is without merit.
In his sixth assignment of error, defendant claims that the trial court erred in admitting evidence of other crimes when it ruled that a letter written by defendant to his brother was admissible. Defendant further argues that he was prejudiced by the admission of "other crimes" evidence when prison official Bruce Dodd and probation officer Toby Lamy testified that he was in prison prior to trial in this case. Defendant also points to Detective Curl. ningham's testimony that he arrested defendant on February 20, 2003, and that defendant was incarcerated from that date forward.
On November 18, 2004, the trial court heard and denied defendant's motion to suppress a letter purported to have been written by defendant to his brother, Lee Taylor, while defendant was in prison awaiting trial in this matter. On June 16, 2005, defendant filed a Motion to Redact Letter, in which he asked the trial court to suppress the letter, or in the alternative, to redact portions of the letter where the prejudicial effect outweighed the probative value. The trial court heard arguments on the motion that day, and held the motion open.
The trial court took up the motion again on March 20, 2006. Defendant argued the letter was highly prejudicial because it was replete with references to the fact that defendant was incarcerated at the state penitentiary at Angola for an unrelated armed robbery conviction prior to his murder trial. The trial court denied defendant's motion to suppress the letter. The judge commented that the jury would not be surprised to hear that a defendant charged with second degree murder was imprisoned while awaiting trial on that charge. The court then took up the issue of whether defendant's letter should be redacted to eliminate references to defendant's unrelated armed robbery charge. The court ordered that all references to defendant's armed robbery charge be removed from the letter.
A redacted version of the letter was admitted into evidence at trial, over defendant's objection. In the portion of the letter admitted at trial, defendant expressed his displeasure with his brother, Lee, for not helping him and Eddie Jackson *100 while they were incarcerated awaiting trial on the murder charge. Defendant also told his brother that he believed Ernest Brown was afraid to testify against him because defendant had threatened to harm Brown's family.
In order to authenticate the letter, the State called Toby Lamy, a probation and parole officer for the State of Louisiana in Jefferson Parish. Lamy testified that in November of 2004, he was supervising defendant's brother, Lee Taylor, for a drug offense. Lamy further testified that he executed a parole search warrant at Lee's house based on Lee's parole violations. At that time, Lamy thought Lee might have had something to do with the Randazzo murder. During the search, Lamy retrieved a letter addressed to Lee. Lamy turned the letter over to Detective Cunningham in connection with the murder investigation.
Bruce Dodd, an attorney who represents the Louisiana State Penitentiary, testified that defendant was housed at Louisiana State Penitentiary at Angola on November 1-3, 2004.[5] Defendant was prisoner number 475424. Lamy was recalled by the State, and he testified the letter was addressed to Lee Taylor from Justin Taylor, prisoner number 475424 at Louisiana State Penitentiary. Defendant objected to the letter's authenticity and the court overruled the objection. The judge explained to the jury that parts of the letter had been redacted.
Prior to the letter's admission, Detective Cunningham testified that he arrested defendant on February 20, 2003, and that defendant was incarcerated from that day forward. The defense objected and moved for a mistrial out of the jury's hearing. Defendant's objection was based on the fact that the State disclosed to the jury that defendant was incarcerated at Angola. The trial court denied the mistrial, stating that the probative value of the testimony outweighed any prejudicial effect.
Generally, evidence of other crimes or bad acts committed by a criminal defendant is not admissible at trial. LSA-C.E. art. 404 B(1); State v. Prieur, 277 So.2d 126, 128 (La.1973). But when evidence of other crimes tends to prove a material issue and has independent relevance other than to show that the defendant is of bad character, it may be admitted by certain statutory and jurisprudential exceptions to this rule. State v. Weatherspoon, 06-539, p. 16 (La.App. 5 Cir. 12/12/06), 948 So.2d 215, 226, writ denied, 07-0462 (La.10/12/07), 965 So.2d 398. A trial judge's determination regarding the relevancy and admissibility of evidence will not be overturned on appeal absent a clear abuse of discretion. State v. Sosa, 04-507, p. 11 (La.App. 5 Cir. 12/12/06), 948 So.2d 236, 243, writ not considered, 07-0077 (La.9/21/07), 964 So.2d 321.
In the instant case, the letter's probative value outweighed any prejudicial effects. The letter was relevant to show defendant's close association with Eddie Jackson, and to demonstrate that Brown was afraid of testifying against defendant. All references to defendant's incarceration were to the period during which he was awaiting trial on the murder charge. Defendant does not point to any specific reference to an armed robbery or any other offense unrelated to the murder. The Angola references were made primarily to lay a foundation for admission of the letter, and not to show defendant was of bad character. As far as the jury knew, defendant was simply incarcerated while *101 awaiting trial on the instant murder charge. As to the letter itself, all references to armed robbery were edited out before the jury viewed it.
Based on our review of the record, along with the applicable law, we find that the trial court did not err in admitting the letter or the authenticating testimony. Accordingly, this assignment of error is without merit.
In his seventh assignment of error, defendant asserts that the trial court erred when it failed to suppress the gun seized at his niece's home, because it was shown that it could not have been the actual murder weapon.
On November 29, 2004, the trial court heard arguments regarding the suppression of the gun seized at the home of defendant's niece, Lashira Jackson. Defendant argued the gun should be suppressed because it was seized pursuant to a search warrant obtained in defendant's armed robbery case, and there was nothing to connect it to the murder. The State argued the gun was recovered from the home of an "associate" of defendant's and that during a police interview, defendant admitted he had put the gun there. The trial court denied defendant's suppression motion, ruling the gun was admissible at trial. Defendant's application for supervisory writs was denied by this Court on January 7, 2005.
On December 29, 2004, defendant, who had new counsel, filed a "Motion to Reconsider Evidentiary Ruling," in which he argued that the trial court should reverse its ruling denying his motion to suppress the gun. At a hearing on January 10, 2005, defense counsel pointed out that when the trial court denied defendant's suppression motion, it did not know that the lawful owners of the gun did not report the weapon stolen from their car until two months after the murder. The State responded that defendant's claims about the gun's ownership were not relevant to the motion to suppress, but would go to the weight of the evidence at trial. The judge stated he would not change his prior ruling that the gun was admissible.
Defendant applied for supervisory writs from the trial court's ruling. This Court denied the writ application on March 9, 2005, and stated that the issues raised by the defense go to the weight of the evidence, rather than its admissibility, and should be left for the jury to decide. The Louisiana Supreme Court denied writs as well. State v. Taylor, 05-0916 (La.4/29/05), 901 So.2d 1077.
On March 20, 2006, defendant filed a motion in limine, asking that the gun be excluded from evidence at trial. The trial court denied the motion. On March 23, 2006, defendant filed a written Trial Stipulation Regarding Gun. At trial, the parties entered into the following oral stipulation, as stated by the prosecutor:
Judge, at this time, I'm offering a stipulation to the defense regarding this weapon. That this gun was found at Lashira Jackson's apartment, that Detective Cunningham, our witness, found that gun on June 10, 2002, and that on June 10, 2002, Detective Cunningham had a conversation with Justin Taylor, the defendant in this case, and he told the detective that he put that weapon in Lashira Jackson's apartment, and that gun is the same gun that was found at the apartment.
The gun at issue was introduced into evidence during the trial testimony of Detective Cunningham. The detective identified it as the gun seized during the search of Lashira Jackson's house. Cunningham described the gun as a .38 Special chrome revolver with a brown handle.
*102 Dr. Fraser Mackenzie, the forensic pathologist who performed an autopsy on Mr. Randazzo's body, identified the bullet fragments he removed from the victim's body during the autopsy. Five of the fragments were composed of lead, and three were of copper. Louise Walzer, an expert in ballistics and firearm examination with the Jefferson Parish Sheriffs Office Crime Lab, testified that the fragments had most likely been fired from a .38 or a .41 caliber weapon, but that .41 calibers are not common anymore. Walzer attempted to make a comparison between State's Exhibit 77, which she identified as a Smith & Wesson handgun, and the bullet fragments. Walzer testified that in this case the bullet fragments were too badly damaged to allow her to make a proper comparison, and that she could not exclude State's Exhibit 77 as the murder weapon.
Ernest Brown, who was an eyewitness to the murder, testified that the killer's gun was shiny and silver and had a brown handle. Brown testified that he told police the murder weapon was a .357 Magnum. When the prosecutor showed him State's Exhibit 77, Brown testified that it looked like the gun the shooter had.
Defendant called Donise Smith as a witness. She testified that on February 7, 2002, she went to her car during her lunch break at work, and found it had been burglarized. The change holder and her gun were missing from the center console. Ms. Smith stated she reported the burglary to the New Orleans Police Department. Ms. Smith testified that State's Exhibit 77 looked like her gun. The serial number on the gun matched the number listed on the police report. She stated that between December 26, 2001 and February 7, 2002, her gun was in her car.
The defense recalled Detective Cunningham. The detective testified that Donise Smith's husband, Adrian Smith, was the registered owner of the gun. On rebuttal, the State called Adrian Smith. Mr. Smith testified he was not certain when his gun was actually stolen. He said it was possible the weapon was missing prior to the day he and his wife reported it stolen.
Defendant now argues, as he did below, that the trial court erred in allowing the gun to be admitted into evidence when there was nothing to connect it to the murder. Before it can be admitted at trial, demonstrative evidence must be properly identified. LSA-C.E. art. 901. A sufficient foundation for the admission of evidence is established when the evidence as a whole shows it is more probable than not that the object is connected with the crime charged. State v. Arita, 04-39, p. 10 (La.App. 5 Cir. 3/1/05), 900 So.2d 37, 43, writ denied, 05-0843 (La.11/29/05), 916 So.2d 165. The identification can be visual, through testimony. The identification can also be accomplished through chain of custody, by tracing the object from the time it was seized to the time it was offered in evidence. Id. Once a proper foundation has been laid with regard to a piece of evidence, a lack of positive identification or a defect in the chain of custody goes to the weight of the evidence rather than its admissibility. Ultimately, a chain of custody is a factual matter for determination by the jury. State v. Addison, 03-1421, p. 25 (La.App. 5 Cir. 3/30/04), 871 So.2d 536, 551, writ denied, 04-1291 (La.10/29/04), 885 So.2d 584.
In the instant case, the State established that the gun had at one time been in defendant's possession. Cunningham testified that it was recovered at the home of defendant's niece, Lashira Jackson, and defendant admitted to Cunningham that he had put it there. It was identified by State witnesses as resembling the gun used in the murder. Ballistics testing did not rule out the gun as the murder weapon. *103 The State laid a sufficient foundation to support the gun's admission in evidence. It was up to the jurors to weigh, Ms. Smith's testimony that she was in possession of the gun on the day of the murder against her husband's testimony that the gun might have been missing prior to the murder. Ms. Smith's testimony was not, as defendant argues, determinative of the gun's admissibility.
Based on the foregoing, the trial judge did not err in allowing the gun to be admitted into evidence. Accordingly, this assignment of error is without merit.
In his eighth assignment of error, defendant argues that the trial court committed reversible error in failing to admonish the jury after the prosecutor made a prejudicial statement during rebuttal closing argument. Defendant complains of the following passage: "He is a cold blooded killer, and you guys have the power to make sure that he doesn't hurt anybody else, anybody else's son ever again." Defense counsel objected to the statement. Out of the jury's hearing, he argued the prosecutor's comment went beyond the scope of what is allowed in closing argument. The judge responded, "It's closing argument. I think it's fair game, number one, and number two, I think saying anything about it now will just call more attention to it." Defense counsel noted his objection, but did not ask the judge to admonish the jury.
LSA-C.Cr.P. art. 774 requires that closing arguments at trial be confined "to evidence admitted, to the lack of evidence, to conclusions of fact that the state or defendant may draw therefrom, and to the law applicable to the case." The trial judge has broad discretion in controlling the scope of closing arguments. Even if the prosecutor exceeds the bounds of proper closing argument, the reviewing court will not reverse a conviction unless there is a reasonable possibility that it might have influenced the jury or contributed to the verdict. State v. Casey, 99-0023, p. 13 (La.1/26/00), 775 So.2d 1022, 1033, cert. denied, 531 U.S. 840, 121 S.Ct. 104, 148 L.E d.2d 62 (2000).
An improper comment during closing argument falls within the ambit of LSA-C.Cr.P. arts. 770 and 771. These articles authorize the trial court to correct a prosecutor's prejudicial remarks by ordering a mistrial or admonishing the jury, upon the defendant's request. However, in the present case, by failing to request an admonition after the prosecutor's comments, defendant has waived his right to complain of the prosecutor's remarks on appeal. Id. See also State v. Smith, 04-340, p. 11 (La.App. 5 Cir. 10/26/04), 888 So.2d 280, 288. In any case, the remarks of which defendant complains would not constitute reversible error, because they cannot reasonably be said to have contributed to the verdict.
Based on the foregoing, the trial court did not err in overruling defendant's objection and failing to admonish the jury after the prosecutor made the complained of remarks. This assignment of error is without merit.
Finally, the Defendant requests an errors patent review. This Court routinely reviews the record for errors patent regardless of whether defendant makes such a request. LSA-C.Cr.P. art. 920; State v. Oliveaux, 312 So.2d 337 (La.1975); State v. Weiland, 556 So.2d 175 (La.App. 5 Cir. 1990). Our review in this case reveals no errors requiring corrective action.
DECREE
For the foregoing reasons, we affirm defendant's conviction and sentence.
AFFIRMED.
NOTES
[1] Donnie McCoy and Lenell Jackson did not testify at trial. Jerry Faulkner, an investigator for the State, testified at trial that he had tried unsuccessfully to serve them with subpoenas.
[2] Brady v. Maryland, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963).
[3] Giglio v. United States, 405 U.S. 150, 92 S.Ct. 763, 31 L.Ed.2d 104 (1972).
[4] Confrontation errors are subject to harmless error analysis and the verdict may stand if the reviewing court determines that the guilty verdict is surely unattributable to the error. Sullivan v. Louisiana, 508 U.S. 275, 279, 113 S.Ct. 2078, 2081-82, 124 L.Ed.2d 182 (1993); State v. Everidge, 96-2665, p. 8 (La.12/2/97), 702 So.2d 680, 685; State v. Davis, 05-987, p. 15 (La.App. 5 Cir, 5/9/06), 930 So.2d 1099, 1107.
[5] The letter in evidence was dated November 1, 2004, and the envelope in which it was apparently mailed is postmarked November 3, 2004.