880 So.2d 255 (2004)
STATE of Louisiana, Appellee
v.
Maurice TATE, Appellant.
No. 38,576-KA.
Court of Appeal of Louisiana, Second Circuit.
August 18, 2004.
*256 Larry English, Shreveport, for Appellant.
*257 Walter E. May, Jr., District Attorney, Daniel W. Newell, Assistant District Attorney, for Appellee.
Before BROWN, CARAWAY and MOORE, JJ.
MOORE, J.
Defendant, Maurice Tate, was convicted of second degree murder and sentenced to life without benefit of probation, parole or suspension of sentence. He now appeals. We affirm.

FACTS
On March 8, 1997, the Haynesville Police Department began investigating a missing person complaint. A 13-year-old girl, Shannon Capers, was last seen that day walking down a road leading to the woods near the Mill Street Apartments. Over two years later, in May 1999, an anonymous caller told authorities where the girl's body could be found. Skeletal remains were discovered at the site.
An investigation led authorities to a former boyfriend of the girl, Maurice Tate. On the day the victim was last seen, Tate had asked an acquaintance, Roderick Russ, to tell the victim to meet him (Tate) in the wooded area near some apartments. Tate had previously told Russ that he was going to kill the young girl. Tate's ex-girlfriend, Charnese McKnight, was the anonymous caller. She testified that Tate had told her he had sex with the girl in the woods, then choked her and shot her in the head.
A bullet was discovered with the remains of the body. The skull had entry and exit holes. Forensic investigators matched the DNA of the girl's mother and uncle with the DNA extracted from the remains. The mother of the victim identified the shoes and shirt as those being worn by the victim when she was last seen.
Another friend of the appellant, Monica Daniels, testified that the defendant had told her he had hit the victim in the head. This testimony was consistent with expert forensic testimony of a bashed area on the forehead of the victim's skull. Monica Daniels further testified that defendant said that the police could never prove that he killed the victim.
Monica Daniels' sister, Leslie, who at one time was involved intimately with defendant, testified at trial that she could not remember her former statement to Detective Ben Booth that she asked the defendant if he had killed the victim and the defendant stated: "Well, maybe I did, maybe I didn't."
Tommy Washington initially testified that he knew nothing about the missing girl and could not recall when the event occurred, and he never spoke with the defendant. He later admitted that defendant asked him what you could put on something dead to stop it from stinking, and he had suggested lime. He testified, however, that the conversation took place long before the victim was missing. When confronted with his testimony a few minutes earlier that he could not recall when the victim had been reported missing, he stated that the conversation took place with the defendant in 1997, long before the girl was missing. In fact, however, the girl was reported missing in 1997.
A jury found Tate guilty of second degree murder. He was sentenced on July 28, 2003. However, that sentence was vacated on July 29, 2003, so that his new counsel, who had enrolled on July 17, 2003, could have an opportunity to file post-trial, pre-sentence motions. A motion for new trial was filed. It was denied on September 2, 2003. Defendant was then re-sentenced to a life term without benefit of parole, probation or suspension of sentence. This appeal is timely.

*258 DISCUSSION
In his first assignment of error, defendant alleges that the trial court erred by not granting his oral motion to continue the trial so that he could retain private counsel.
After the jury was selected and sworn, defendant orally moved to replace his court-appointed attorney with private counsel hired by his relatives. The defendant told the court that he did not think his court-appointed attorney was able to prepare a "solid defense" because of a heavy case load.
The trial court determined that the appellant's family had contacted a private Shreveport attorney the previous day. However, according to information from the attorney's office, no retainer had been paid, and the attorney had informed his staff that he "might get involved in" a case in Claiborne Parish. The attorney was in court and could not be reached for confirmation. Defendant's brother, through defendant's appointed counsel, assured the court that he would pay the retainer. The trial court was particularly concerned, however, that the private attorney had not communicated with the court about enrolling in the case, even though, according to the judge, the attorney knew her telephone number. Citing State v. Willis, 36,198 (La.App. 2 Cir. 8/14/02), 823 So.2d 1072; writ denied, State ex rel. Willis v. State, XXXX-XXXX (La.4/8/04), 870 So.2d 262, the court informed the appellant that he did not have the right to a continuance in order to change attorneys on the day trial was to begin.
The court noted that he had been indicted on March 5, 2001, and his court-appointed attorney had filed motions on March 22, 2001, indicating that "two years and almost four months" had passed. The trial court denied the continuance, but gave the appellant the option of representing himself or continuing with the court-appointed attorney. He chose the latter.
Continuances for criminal trials are governed by La. C. Cr. P. art. 707, which reads:
A motion for a continuance shall be in writing and shall allege specifically the grounds upon which it is based and, when made by a defendant, must be verified by his affidavit or that of his counsel. It shall be filed at least seven days prior to the commencement of trial.
Upon written motion at any time and after contradictory hearing, the court may grant a continuance, but only upon a showing that such motion is in the interest of justice.
La. C. Cr. P. art. 708 explains the difference between a continuance and a recess. It states:
A continuance is the postponement of a scheduled trial or hearing, and shall not be granted after the trial or hearing has commenced. A recess is a temporary adjournment of a trial or hearing that occurs after a trial or hearing has commenced.
In this instance, the appellant made an unsupported, untimely, oral, pro se request for a continuance after the jury was selected and sworn, but before the first witness testified. The jury had been sworn the day before. On these grounds alone, the trial court was justified in denying the continuance.
The right to choose one's own attorney is a right that must be exercised at a reasonable time at the appropriate stage in the proceedings within the framework of the criminal justice system. State v. Leggett, 363 So.2d 434 (La.1978). There is no constitutional right to make a new choice of counsel on the very date the trial is to begin, with the attendant necessity *259 of a continuance and its disrupting implications to the orderly trial of cases. Id. Based upon this record, we conclude that the defendant had ample time prior to trial to timely acquire a private attorney had he wished to do so. State v. Willis, supra. Accordingly, this assignment is without merit.
In his second and third assignments of error, defendant contends that the trial court erred in denying his motions for mistrial. By his second assignment of error, defendant contends that the trial court erred by denying his motion for mistrial on grounds of the prejudicial effect of hearsay testimony by Det. Ben Booth allegedly linking the defendant to the missing victim. By his third assignment, defendant argues that the trial court erred by not granting his motions for mistrial based upon the state's failure to disclose a map drawn by Charnese McKnight and a written statement to police by Monica Daniels. The defendant argues that withholding these two items indicates a clear pattern of the state's failure to disclose key documents to the defendant.
Mistrial is a drastic remedy which should be granted only when the defendant suffers such substantial prejudice that he has been deprived of any reasonable expectation of a fair trial. State v. Sepulvado, 359 So.2d 137 (La. 1978); State v. Stills, 600 So.2d 134 (La. App. 2 Cir.1992). A mistrial is warranted when certain remarks are considered so prejudicial and potentially damaging to the defendant's rights that even a jury admonition could not provide a cure. State v. Edwards, 97-1797 (La.7/2/99), 750 So.2d 893, cert. denied, 528 U.S. 1026, 120 S.Ct. 542, 145 L.Ed.2d 421 (1999). A trial court's ruling denying a mistrial will not be disturbed absent an abuse of discretion. State v. Givens, 99-3518 (La.1/17/01), 776 So.2d 443.

HEARSAY
The jury learned from the state's opening statement that the victim had been missing since March 1997, and, in 1999, an anonymous telephone caller told authorities where to find the body. The state informed the jurors that a former girlfriend of the defendant would testify that she was the anonymous caller.
Following the opening statements, the state's first witness, Det. Ben Booth, testified that
In 1999, in May of 1999, we received an anonymous tip call. The Haynesville Police Department received an anonymous call stating that Shannon Capers' body was buried in the woods behind the Killgore house there in Haynesville, Louisiana, and the first call came in on May 5th. Chief David Mills, Lieutenant David Crump of the Claiborne Parish Sheriff's Office, and another Haynesville police officer, Chris Smith, searched the woods at that time. They could not find anything. Then two days later on May 7th, the Haynesville Police Department received another call from this same caller stating that we missed the body, that Maurice Tate (Emphasis added).
Upon mention of the defendant's name, the defense attorney objected that the statement was hearsay. The trial court agreed and struck the statement.
The defense attorney then asked for a mistrial. After removing the jury from the courtroom, the trial court gave the defense an opportunity to show "that the sustaining of the hearsay objection [was] not sufficient:"
MR. GARNER: That's correct, your Honor, because at this point we now have the jury believing on the basis of inadmissible evidence that the person who made this anonymous call knew or *260 told the police that Maurice Tate was involved in the placement of that body and implicitly therefore in the murder.
THE COURT: We've got just to "Maurice Tate", and then the objection.
MR. NEWELL: I don't think that came out, your Honor. All he said was "Maurice Tate", and he immediately objected.
THE COURT: Yeah, "Maurice Tate", and was stopped. I mean you objected there. So, I mean, what you're indicating is that's the only natural implication.
MR. GARNER: That's correct. I don't think that there's any
THE COURT: Although his words were stopped
MR. GARNER:way that that can be cured.
THE COURT:at that point.
MR. GARNER: Yes, your Honor.
Mr. Garner argued that he assumed the state would later attempt to link Tate to the call and that would allow the state to have an "additional basis for persuasion... the well has been tainted. They've already got something in their minds about that."
The trial court denied the mistrial and then admonished the jury to disregard the statement that gave rise to the objection. She informed them it was inadmissible hearsay and that it was not to be considered by them.
Appellant argues that the statement made early in the trial planted in the jury's mind that the appellant was guilty and subsequent evidence only "cemented that conclusion." We do not agree.
La. C. Cr. P. art. 775 governs the grounds for mistrial:
A mistrial may be ordered, and in a jury case the jury dismissed, when:
(1) The defendant consents thereto;
(2) The jury is unable to agree upon a verdict;
(3) There is a legal defect in the proceedings which would make any judgment entered upon a verdict reversible as a matter of law;
(4) The court finds that the defendant does not have the mental capacity to proceed;
(5) It is physically impossible to proceed with the trial in conformity with law; or
(6) False statements of a juror on voir dire prevent a fair trial. Upon motion of a defendant, a mistrial shall be ordered, and in a jury case the jury dismissed, when prejudicial conduct in or outside the courtroom makes it impossible for the defendant to obtain a fair trial, or when authorized by Article 770 or 771.
A mistrial shall be ordered, and in a jury case the jury dismissed, when the state and the defendant jointly move for a mistrial.
Based upon our review of the record, particularly the subsequent testimony and evidence linking the defendant to the crime, we conclude that defendant was not prejudiced by Det. Booth's incomplete statement that was terminated by his counsel's objection at the mention of his name. Charnese McKnight testified that she was the anonymous caller and that the defendant called her and told her he had killed the girl. She testified that he said that he told a friend to tell the victim to meet him in the woods, that he had sex with her and then he choked her and shot her in the head. She also testified that he told her where he had buried the body.
Roderick Russ testified that not long before the victim was missing the appellant had told him he was going to kill her. Russ further testified that on the day the *261 victim was last seen, the defendant had asked him to tell the victim to meet him "on the back road of Mill Street."
Other testimony established that the victim's body had been buried in the woods near Mill Street, that the body had a gunshot hole in the skull and that a .380 caliber bullet was retrieved from the grave site. Russ testified that the defendant owned "a .45 and a .38, or a .44."
Another witness, Tommy Washington, testified that in 1997 the area around Mill Street "just smelled bad" and that the appellant asked him in March 1997 "what was good to put on something to keep it from stinking."
In State v. Davis, 339 So.2d 825 (La. 1976), the supreme court held that the unsolicited answer of a witness that other people had stated that the defendant had stabbed a lady, which was clearly inadmissible hearsay, was not of such prejudicial nature to require the grant of a mistrial by the trial judge who admonished the jury to disregard the statement as hearsay, since the statement was merely cumulative or corroborative of testimony of other witnesses.
We conclude that the defendant was not prejudiced by the remark so as to constitute reversible error, and the trial court did not abuse its discretion in denying the motion for mistrial. The remark by Det. Booth, although hearsay, did not expressly identify the defendant to the crime and the alleged inference is extremely thin. Even if the remark connected the defendant or implied that he committed the crime, in this instance, the court's admonishment to the jury to disregard the remark was sufficient. Other evidence clearly identified the defendant with the crime. Defendant was not denied a fair trial nor did the trial judge's refusal to order a mistrial result in miscarriage of justice. State v. McMahon, 391 So.2d 1120 (La.1980).
This assignment is therefore without merit.

BRADY VIOLATIONS
At trial, the state introduced a map drawn by Charnese McKnight for police and signed by her on March 1, 2000 indicating the location of the victim's body. Defendant did not initially object when the map was admitted into evidence, but moments later when the state asked that the map be published to the jury, the defense moved for a mistrial on grounds that the map had not been produced pursuant to pre-trial discovery requests under La. C. Cr. P. art. 718. The court denied the motion.
The map was essentially the same as a map drawn by a police witness and introduced earlier into evidence depicting the approximate location of the body. Further, the state had already established that the defendant told McKnight about the murder. Defendant's primary argument on appeal is that the failure to provide the map along with the Brady violation discussed below demonstrates a pattern of discovery violations by the state warranting a mistrial.
Prior to trial, the state sent the defense two notices of intent to use inculpatory statements made by defendant to Monica Daniels. The first notice was sent on February 4, 2003. That notice states that the defendant told Monica Daniels that "the police could not prove he killed Shannon Capers." A second notice was sent on June 19, 2003, just four days before trial began on June 23, 2003, stating that "[d]uring the summer of 1997, Maurice Tate told Monica Daniels that he killed Shannon Capers by hitting her in the head and shooting her."
Regarding this second statement, the prosecutor explained that he was interviewing *262 Ms. Daniels on June 19, 2003 in preparation for trial when she stated that Maurice Tate told her that he killed Shannon Capers by hitting her in the head. He immediately filed a Notice of Intent in the suit record. At this time, the prosecutor was unaware of an earlier recorded statement by Daniels to Det. Booth that was inconsistent with the June 19, 2003 statement.
Five months prior to the second notice, on January 15, 2003, Det. Booth interviewed Monica Daniels for the stated purpose of going over what she had told him in a previous interview on October 1, 2000. During the recorded interview, Daniels stated that she learned from the defendant's girlfriend, Charnese McKnight, and not from the defendant, that the defendant had taken Shannon Capers in the woods, hit her in the head and shot her in the head. She denied talking to Maurice about the murder, stating that "he wouldn't talk about it." She confirmed, however, that Maurice Tate told her that "the police could not prove he killed Shannon."
Hence, the inconsistent statement was not made until June 19, 2003 when McKnight told the prosecutor that the defendant himself told her he hit and shot the victim. Even at this time, the prosecutor did not have actual knowledge that the statement of June 19, 2003 was inconsistent with the January 15, 2003 recorded statement, since he was unaware of the January 15 statement.
On June 25, at trial, Monica Daniels testified that she asked the defendant if he had killed Shannon Capers, and the defendant told her that "he hit her in the head" and the "police could never prove that he did it." When asked whether the defendant said anything else regarding what he did after he hit her, she responded that he did not.
On cross-examination, counsel for defendant attacked Ms. Daniels' credibility by asking her about her felony record. He also established that she had violated her probation and attempted to connect her testimony to her release from jail. At this time defense counsel also asked Daniels if she told Det. Booth something different in an earlier statement. Ms. Daniels said she had not.
On re-direct, the prosecutor attempted to expand the questioning beyond the scope of cross-examination based on the line of questioning on cross regarding what Daniels had told Det. Booth. The defense objected and the court removed the jury from the courtroom to hear arguments. At this time, defense counsel said he had asked Daniels if she told Det. Booth in an earlier interview something different than what she had recently said, because, as he explained to the court, the two Notices of Intent were inconsistentthe first stating that the defendant told her that the police could not prove he killed the victim, while the second stating that the defendant told her he hit and shot the victim in the head.
The court reviewed the two Notices of Intent questioning aloud why Ms. Daniels would make a substantially more incriminating statement in the second notice as opposed to her earlier statement. The court then sustained the defense's objection to the line of questioning that the prosecutor attempted to open. The jury returned to the courtroom and the prosecutor asked no further questions of Monica Daniels. Ms. Daniels was dismissed subject to recall and instructed regarding the rule of sequestration.
Later in the afternoon or evening of June 25, the state prosecutor discovered the transcript of the recorded statement of January 15, 2003. He immediately supplied the transcribed statement to defense *263 counsel. Defendant moved for a mistrial on grounds of a Brady violation.
Hearing the motion the next day, the court noted that the second Notice of Intent was not really inconsistent with the first Notice of Intent, but represented an amplification. On the other hand, the transcribed statement of the January 15 recorded statement of Daniels was clearly inconsistent with the June 19 statement, and this was the focus of the Brady violation.
The court noted that Monica Daniels was available to be called back by the state if the defense wanted to impeach her testimony using the prior inconsistent statements on January 15, 2003. Defense counsel elected not to put Daniels back on the stand stating that he believed that he could possibly further prejudice his client if he attempted to rectify the damage caused by Daniels' testimony by introducing the inconsistent statements.
The trial court denied the motion for mistrial on grounds that, taken as a whole, the inconsistent statement of January 15, 2003 was "not so significant that the trial proceedings are defective." Elaborating, the court noted that while the January 15 statement was inconsistent with the statement attributed to Daniels in the June 19, 2004 Notice of Intent, Ms. Daniels' actual testimony was considerably less damaging than the statement she made on June 19 and also, the actual testimony was less inconsistent with the January 15 statements than the June 19 statement. Ms. Daniels testified at trial only that the defendant told her that he hit the victim in the head and the police could not prove he did it. In other words, the inconsistent statements of which the state failed to disclose were largely inconsistent with statements Daniels made on June 19 prior to trial, but much less so with respect to her actual testimony at trial which the jury heard. Daniels did not testify that the defendant told her he shot the victim.
On appeal, the defendant contends the trial court should have granted a mistrial based upon the ground that the state failed to disclose the map drawn by Ms. McKnight and the prior inconsistent statements constituting exculpatory evidence under Brady v. Maryland, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963).
The purpose of pretrial discovery procedures is to eliminate unwarranted prejudice to a defendant that could arise from surprise testimony. State v. Mitchell, 412 So.2d 1042, 1044 (La.1982). Discovery procedures enable a defendant to properly assess the strength of the state's case against him in order to prepare his defense. State v. Roy, 496 So.2d 583 (La.App. 1 Cir.1986), writ denied, 501 So.2d 228 (La.1987). If a defendant is lulled into a misapprehension of the strength of the state's case by the failure to fully disclose, such a prejudice may constitute reversible error. State v. Ray, 423 So.2d 1116, 1118 (La.1982).
Under the United States Supreme Court decision in Brady, supra, the state, upon request, must produce evidence that is favorable to the accused where it is material to guilt or punishment. This rule has been expanded to include evidence that impeaches the testimony of a witness where the reliability or credibility of that witness may be determinative of guilt or innocence. Giglio v. U.S., 405 U.S. 150, 92 S.Ct. 763, 31 L.Ed.2d 104 (1972). Where a specific request is made for such information and the subject matter of such a request is material, or if a substantial basis for claiming materiality exists, it is reasonable to require the prosecutor to respond either by furnishing the information or by submitting the information to the trial judge for an in camera inspection. *264 See U.S. v. Agurs, 427 U.S. 97, 96 S.Ct. 2392, 49 L.Ed.2d 342 (1976); State v. Cobb, 419 So.2d 1237 (La.1982).
The test for determining materiality was firmly established in U.S. v. Bagley, 473 U.S. 667, 105 S.Ct. 3375, 87 L.Ed.2d 481 (1985), and has been applied by the Louisiana Supreme Court. See State v. Rosiere, 488 So.2d 965 (La.1986). The evidence is material only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different. A "reasonable probability" is a probability sufficient to undermine confidence in the outcome. Bagley, 473 U.S. at 682, 105 S.Ct. at 3383.
In this instance, the defense had the opportunity to further attack Monica Daniels credibility when it was given a copy of the transcribed recorded statement of January 15, 2003, but declined to do so for reasons of trial strategy. If he had done so, Ms. Daniels might have given testimony even more damaging than her previous testimony. As it stood, she had testified only that the defendant said he hit the victim, and he said the police could not prove he had done it. The only inconsistency was that he told her himself that he had hit the victim in the head. In her January 15, 2003 statement, she said Charnese McKnight told her that he hit the victim in the head and shot her in the head.
As previously noted, Charnese McKnight testified that the defendant told her he killed Shannon Capers and described how, when and where the murder occurred. Roderick Russ testified that the defendant said he was going to kill the victim and used him to get her to meet him on the day of the murder. Other testimony and forensic evidence corroborated this testimony and tended to identify the defendant as the killer. Hence, Monica Daniels' testimony was cumulative and corroborative in nature.
After reviewing this trial record and statements of Ms. Daniels, we conclude that the undisclosed January 15, 2003 inconsistent statement of Monica Daniels constituted a Brady violation because it was favorable to the defendant for impeachment purposes. Giglio v. U.S., supra. However, we also conclude that the failure to disclose did not result in reversible error. The evidence simply did not rise to the level of materiality in this instance. U.S. v. Bagley, supra. Although Monica Daniels' testimony was used to bolster the state's case, we are confident that had the defense known of the prior inconsistent statement of Ms. Daniels earlier and used it to impeach her testimony, or had Ms. Daniels testified only that the defendant told her that police could not prove he killed the victim, or even if Ms. Daniels had not testified at all, the outcome of this case would not have been different.
Accordingly, the trial court did not error in denying the defendant's motions for mistrial.

CONCLUSION
For these reasons, we affirm the defendant's conviction and sentence.
AFFIRMED.