7 So.3d 838 (2009)
STATE of Louisiana, Appellee
v.
Dennis D. THOMAS, Appellant.
No. 44,113-KA.
Court of Appeal of Louisiana, Second Circuit.
April 8, 2009.
Rehearing Denied May 7, 2009.
*840 Louisiana Appellate Project by G. Paul Marx, Lafayette, for Appellant.
Dennis D. Thomas, In Proper Person.
Paul J. Carmouche, District Attorney, J. Dhu Thompson, John Ford McWilliams, Jr., Assistant District Attorneys, for Appellee.
Before CARAWAY, DREW and MOORE, JJ.
MOORE, J.
Dennis D. Thomas was indicted for the second degree murder of Carlos Chambers. Following a bench trial, he was found guilty of the lesser included offense of manslaughter and sentenced to 33 years at hard labor. He now appeals, raising four assignments of error through counsel and three assignments in proper person. We affirm.

Factual Background
Thomas and his victim, Chambers, had known each other in Shreveport's Lakeside neighborhood since November 2005. Thomas testified that he bought marijuana from Chambers a few times at a house on Andrew Avenue where "TT" Easter lived. On the evening of January 4, 2006, Chambers and his girlfriend, Teouna Fuller, who was pregnant with his baby, drove to TT's house. Chambers went inside while Fuller stayed in the car, her sister's 2004 Chevy Cavalier, sleeping. She was wakened by the sound of Thomas talking to her through the car window, asking where Chambers was; she replied that he was not in the car. On the front porch of the house, however, Chambers saw Thomas talking to his girlfriend, and ran out to the car to confront him. Chambers, the smaller man, took a swing and landed a blow that busted Thomas's lip; a fight ensued in which Thomas gave Chambers a bloody nose and multiple bruises. No weapons were involved, and the men left the scene.
The next day, around 4:00 pm, Thomas was walking along Milam Street near Hearne Avenue when the Chevy Cavalier drove by, Chambers at the wheel and Ms. Fuller in the front passenger seat. Chambers turned around, drove up alongside Thomas and called him over. Thomas and Ms. Fuller essentially agree that at first, Chambers asked if everything between the two men was all right. According to Ms. Fuller, Thomas suddenly pulled a black handgun, pointed it through the passenger window and fired several shots into Chambers's body. At trial, however, Thomas maintained that the men argued: Chambers accused Thomas of disrespecting him by talking to his girlfriend behind his back and exclaimed that she was not a bitch. According to Thomas, when the words got heated, he saw Chambers grab for a gun and start to point it at him, at which time Thomas grabbed his own weapon and fired several shots in self-defense.
Mortally wounded, Chambers managed to drive the Chevy a few blocks to the intersection of Hearne at Dunlap, where he rear-ended another car. Ms. Fuller immediately called 911 on her cell; EMTs came within minutes, and the police arrived about the time Chambers's body was being placed in the ambulance. Chambers was declared dead shortly after arrival at *841 LSU Health Sciences Center; the coroner's report stated that he died from multiple gunshot wounds. An autopsy identified six entry wounds to his shoulders and upper arms.
Officers searched the car at the scene, and again at the impound lot, but found no weapon or ammo in the car other than a.357 slug extracted from the inside of the driver's door. Ms. Fuller told officers that there was no gun in the car; she was studying to become a nurse, and being involved in a firearms offense would prejudice her chance of obtaining a license. At the scene of the shooting, officers also found no weapon, only two .22 shell casings and some broken glass.
Ms. Fuller described the suspect as a black male, six feet or taller, with a busted lip, wearing a white headband and headphones. Initially, she could not think of his name; moments later she told Detective Jeff Brown that he was Dennis Thomas. At the police station, she positively identified Thomas from a photo lineup. Det. Brown also testified that through anonymous 911 calls, police learned that Thomas was living with his grandparents on Ashton Street, some two blocks from the scene of the shooting.
With this information, around 8:00 pm several officers surrounded the house on Ashton Street and knocked on the door, asking for Thomas. The grandmother answered, and then Thomas himself came to the door. Officer A.L. Harvey testified that Thomas immediately put his hands up, but then turned around and ran into the house. Officers entered and placed him under arrest. According to Officer Harvey, without any prompting Thomas said, "I know y'all think I shot that nigger," and stated that Chambers had hit him the night before. Officers gave him his Miranda rights.
At the police station, Thomas told Detective Shawn Parker, "I can't believe this. I don't know anything about this. I don't know why I'm being charged with this." Thomas again admitted that he and Chambers had been in a fight that morning, and that later that day Chambers drove up to him; however, Thomas maintained that he got scared and ran away. He claimed to know nothing about the shooting.
Back at the house on Ashton Street, officers searched Thomas's bedroom, finding a white bandana on the dresser and a Walkman elsewhere in the room. Under the house they found a Rossi .357 revolver. Corporal Danny Duddy testified that the gun yielded no usable fingerprints, but he swabbed it for any possible DNA evidence. Connie Brown, an analyst at the North Louisiana Crime Lab, analyzed the swab and a reference sample from Thomas. She testified that the swab contained DNA from at least two persons and Thomas could not be excluded as one of those persons. Based on statistics from the FBI lab, however, she testified that 99.7% of the population could be excluded as a DNA donor. Richard Beighley, a criminalist at the crime lab, analyzed the Rossi revolver found under the house on Ashton Street and the slug extracted from the door of the Chevy Cavalier. He concluded that the slug was fired from the Rossi, although he admitted there is no such thing as a "perfect match" between a gun and bullet.

Trial Testimony
After his indictment for second degree murder, Thomas elected a bench trial which took place over three days in September, October and November 2007. The state's witnesses testified as outlined above.
On the second day of trial, the district court excluded the grand jury testimony of a witness named Crystal Brown, which Thomas contended was exculpatory. The *842 state argued, and the court agreed, that although Ms. Brown was unavailable to testify, her prior testimony was not subject to cross-examination and hence was inadmissible hearsay under La. C.E. art. 804 B(1). Thomas proffered the transcript under seal.
Thomas testified that early on the morning of the shooting, he had been talking to Ms. Fuller in front of TT's house on Andrew Avenue, that Chambers had confronted him about talking to his girlfriend, and that the two men had fought with the result that Thomas sustained a badly cut lip. He asserted that Chambers was "starting to make it rough around the neighborhood," and he heard that after this incident Chambers was looking for a gun. He admitted that when he first spoke to police detectives, he said he knew nothing about the shooting, but that in point of fact he pulled the gun and fired on Chambers only when he saw Chambers pulling a gun on him. He insisted that he acted purely in self-defense even though he never said this at the time. He also maintained that he had never seen or handled the Rossi revolver seized from under his grandmother's house; he dropped his own gun by a fence near that house. He also disputed that he tried to run away when Officer Harvey knocked on the door; he merely stepped back, lay on the floor, and let officers arrest him in front of his grandparents.
In support of the claim of self-defense, Thomas called Dwight Davis, a convicted felon now serving in the Natchitoches Detention Center. Davis testified that he knew Chambers and was at TT's house on Andrew Avenue when Chambers and Thomas got into the fight. After being bested in the fight, Chambers got up off the ground and ran to the house, asking TT where the "scrap" (gun) was, and saying he was going to shoot Thomas. Davis thought Chambers was serious about wanting to hurt Thomas.
Ms. Fuller testified that at the time of the shooting, Chambers was not threatening Thomas and was not carrying a gun. She reiterated that she would not handle a gun or even be around one because she wanted to become a nurse. She admitted that Chambers had been very agitated after the fistfight but that he had calmed down and never said anything about getting a gun to go shoot Thomas.
As noted, the district court found Thomas guilty of the lesser included offense of manslaughter. The court denied motions for new trial and for post verdict judgment of acquittal. The court then held a sentence hearing in which five witnesses testified, including Ms. Fuller, Chambers's mother, two of Thomas's relatives, and Thomas himself. Citing this testimony, the trial evidence and Thomas's arrest record, the court sentenced him to 33 years at hard labor. It later denied Thomas's motion to reconsider sentence.

Discussion: Sufficiency of the Evidence
By his second assignment of error, Thomas urges the verdict was contrary to the evidence: he acted in self-defense against a man who was mad with jealousy, continued to bully and threaten him, and would have shot Thomas had not Thomas fired first. By his first pro se assignment, Thomas urges that the district court erred in denying his motion for acquittal when the evidence did not negate his claim of self-defense.
The state responds that apart from Thomas's own self-serving testimony, the evidence uniformly negated the theory of self-defense.
The standard of appellate review is "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found *843 the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979); State v. Tate, XXXX-XXXX (La.5/20/03), 851 So.2d 921, cert. denied, 541 U.S. 905, 124 S.Ct. 1604, 158 L.Ed.2d 248 (2004). This standard, now legislatively embodied in La. C. Cr. P. art. 821, does not provide the appellate court with a vehicle to substitute its own appreciation of the evidence for that of the fact finder. State v. Pigford, XXXX-XXXX (La.2/22/06), 922 So.2d 517. The trier of fact is charged to make a credibility evaluation and may, within the bounds of rationality, accept or reject the testimony of any witness; the reviewing court may impinge on that discretion only to the extent necessary to guarantee the fundamental due process of law. State v. Sosa, XXXX-XXXX (La.1/19/06), 921 So.2d 94.
As it pertains to this case, manslaughter is defined in La. R.S. 14:31 A as follows:
(1) A homicide which would be murder under either Article 30 (first degree murder) or Article 30.1 (second degree murder), but the offense is committed in sudden passion or heat of blood immediately caused by provocation sufficient to deprive an average person of his self-control and cool reflection. Provocation shall not reduce a homicide to manslaughter if the jury finds that the offender's blood had actually cooled, or that an average person's blood would have cooled, at the time the offense was committed; or
(2) A homicide committed, without any intent to cause death or great bodily harm.
(a) When the offender is engaged in the perpetration or attempted perpetration of any felony not enumerated in Article 30 or 30.1, or of any intentional misdemeanor directly affecting the person[.]
A homicide is justifiable when committed in self-defense by one who reasonably believes that he is in imminent danger of losing his life or receiving great bodily harm and that the killing is necessary to save himself from that danger. La. R.S. 14:20 A(1); State v. Faulkner, 441 So.2d 721 (La.1983); State v. Gaddis, 36,661 (La.App. 2 Cir. 3/14/03), 839 So.2d 1258, writ denied, XXXX-XXXX (La.5/14/04), 872 So.2d 519. When self-defense is raised as an issue by the defendant, the state has the burden of proving beyond a reasonable doubt that the homicide was not committed in self-defense. State ex rel. D.P.B., XXXX-XXXX (La.5/20/03), 846 So.2d 753; State v. Gaddis, supra. When the defendant challenges the sufficiency of the evidence in such a case, the question becomes whether, viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found beyond a reasonable doubt that the homicide was not committed in self-defense. State ex rel. D.P.B., supra; State v. Gaddis, supra.
Because Thomas admittedly killed Chambers, the only issue is whether he reasonably believed that he was in imminent danger of death or great bodily harm and that deadly force was necessary to save himself. Even if Chambers really pulled a gun, the fact that Thomas shot him six times before Chambers got off a single round seems to refute the theory of reasonable necessity. Moreover, the evidence overwhelmingly shows that Chambers was not armed. Thomas testified that Chambers reached across his torso with his right hand, as though to grab a gun, and did indeed point a gun at him. Ms. Fuller, however, testified not only that Chambers was not carrying a gun, but that she would not allow a gun in her car as it could adversely affect her nursing career. Police searched the Chevy twice, finding *844 no gun or ammo. Even Thomas's own witness, Davis, admitted that prior to this incident he had never seen Chambers carrying a gun.
In addition, Thomas's credibility was severely strained by his statements to police, which initially denied any knowledge of the killing but then morphed into a self-serving claim that Chambers pulled a gun on him. His persistent denial that he had ever touched the Rossi revolver, which was found under his grandmother's house, and mostly likely fired the slug recovered from the Chevy's door, was seriously questioned by DNA evidence that placed him in a scant 0.3% of the population that could have handled the gun.
On these facts, the district court could find beyond a reasonable doubt that Chambers did not pull a gun on Thomas and thus his deadly reaction could not be justified. These assignments of error lack merit.

Admission of Grand Jury Testimony
By his first assignment of error, Thomas urges the district court erred in excluding the exculpatory grand jury testimony of an eyewitness, Crystal Brown. He contends that Ms. Brown told the grand jury she saw Chambers make a "sudden move for something under the seat," which would support his claim of self-defense. He argues that the technical rules of evidence, upon which the district court relied to exclude the evidence, must yield to the defendant's sixth amendment right to present a meaningful defense. Holmes v. South Carolina, 547 U.S. 319, 126 S.Ct. 1727, 164 L.Ed.2d 503 (2006); State v. Juniors, 2003-2425 (La.6/29/05), 915 So.2d 291, cert. denied, 547 U.S. 1115, 126 S.Ct. 1940, 164 L.Ed.2d 669 (2006). He also suggests that La. C.E. art. 804 B(1), upon which the district court relied, does not actually apply to Ms. Brown's grand jury testimony.
The state responds that the court's ruling was correct, as at trial the state's motive in cross-examining Ms. Brownto show how most of her testimony conflicted with other testimony and physical evidencewould be dissimilar from its motive in the grand jury hearing, where only direct examination was available. The state submits that under Art. 804 B(1), such testimony is inadmissible.
As a general rule, the defendant is not entitled to production of a transcript of a secret grand jury proceeding against him, even for use at trial in conducting cross-examination. La. C. Cr. P. art. 434; State v. Higgins, XXXX-XXXX (La.4/1/05), 898 So.2d 1219, cert. denied, 546 U.S. 883, 126 S.Ct. 182, 163 L.Ed.2d 187 (2005); State v. Taylor, 07-93 (La.App. 5 Cir. 11/27/07), 973 So.2d 83, writ denied, 2007-2454 (La.5/9/08), 980 So.2d 688. This is to encourage the full disclosure of information about a crime. Id. However, there is an exception to the rule when the grand jury record contains evidence favorable to the accused that is material to guilt or innocence. Id. In response to a specific request stated with particularity, the trial court may review the grand jury transcripts in camera to determine if they contain any exculpatory evidence. Id.; State v. Peters, 406 So.2d 189 (La.1981).
According to defense counsel, Ms. Brown testified before the grand jury as follows:
He [Thomas] was walking up the sidewalk coming from a store drinking a Sprite. A car pulled up and they were standing there arguing. In a few minutes they stopped arguing. He went to reach for something or whatever. But the other guy reached in his pocket, pulled out a gun, made three shots. The young lady screamed. The car sped off and he went up on the sidewalk.
*845 Because defense counsel made a specific request to introduce this testimony, the district court should have conducted an in camera review to see if the statement was truly exculpatory. State v. Higgins, supra; State v. Peters, supra. No such in camera review took place, but our own review shows that the statement was not exculpatory. Ms. Brown did not say she saw a weapon, only that the victim "went to reach for something or whatever." She confirmed that Chambers never fired a shot but that Thomas fired several shots. In short, her testimony is cumulative and not truly exculpatory. Had the district court conducted the in camera review, the result would have been the same.
Moreover, the state's construction of La. C.E. art. 804 B(1), while perhaps overbroad, is essentially correct. This article states that certain evidence is "not excluded from the hearsay rule if the declarant is unavailable as a witness":
(1) Former testimony. Testimony given as a witness at another hearing of the same or a different proceeding, if the party against whom the testimony is now offered * * * had an opportunity and similar motive to develop the testimony by direct, cross, or redirect testimony.
When the defendant seeks to introduce secret grand jury testimony against the state, he or she must show a "similar motive." United States v. Salerno, 505 U.S. 317, 112 S.Ct. 2503, 120 L.Ed.2d 255 (1992). Plainly, in the grand jury the state would have called Ms. Brown on direct examination to establish the crime; at trial, the state would cross-examine her to discredit her recollection (for example, with respect to the number of shots fired). The record supports the finding of a dissimilar motive. This assignment lacks merit.

Excessive Sentence
By his third assignment of error, Thomas urges his near-maximum sentence of 33 years at hard labor is excessive. He contends the district court failed to give fair and sufficient weight to mitigating factors such as his age, relative lack of criminal history, and the provocation by the victim. He also reiterates that he acted in self-defense.
The state responds that the sentence was no abuse of discretion, given the violence of the offense, together with Thomas's subsequent conduct, including his flight and lack of remorse.
Appellate review of sentences for excessiveness is a two-pronged inquiry. First, the record must show that the sentencing court complied with La. C. Cr. P. art. 894.1. The court need not list every aggravating or mitigating factor so long as the record reflects that it adequately considered the guidelines. State v. Smith, 433 So.2d 688 (La.1983); State v. Woods, 41,420 (La.App. 2 Cir. 11/1/06), 942 So.2d 658, writs denied, 2006-2768, 2781 (La.6/22/07), 959 So.2d 494. When the record shows an adequate factual basis for the sentence imposed, remand is unnecessary even in the absence of full compliance with the article. State v. Lanclos, 419 So.2d 475 (La.1982). The court is not required to assign any particular weight to any specific matters at sentencing. State v. Quiambao, 36,587 (La.App. 2 Cir. 12/11/02), 833 So.2d 1103, writ denied, XXXX-XXXX (La.5/16/03), 843 So.2d 1130.
The second prong is constitutional excessiveness. A sentence violates La. Const. Art. 1, § 20 if it is grossly out of proportion to the seriousness of the offense or nothing more than a purposeless and needless imposition of pain and suffering. State v. Dorthey, 623 So.2d 1276 (La.1993). A sentence is deemed *846 grossly disproportionate if, when the crime and punishment are viewed in light of the harm done to society, it shocks the sense of justice or makes no reasonable contribution to acceptable penal goals. State v. Guzman, 99-1528 (La.5/16/00), 769 So.2d 1158. The district court has wide discretion in imposing a sentence within the statutory limits, and such a sentence should not be set aside as excessive in the absence of a manifest abuse of that discretion. State v. Williams, XXXX-XXXX (La.12/13/04), 893 So.2d 7.
The district court did not order a presentence investigation report but it presided over a three-day trial and a sentence hearing in which five witnesses testified. The court demonstrated a firm grasp of the facts of the offense and all relevant sentencing guidelines. The court specifically cited Thomas's "youth and education, his relative lack of criminal history to include misdemeanor simple battery with no conviction, and a felony arrest for drugs"; the circumstances surrounding the offense, including the fight hours earlier; and the senseless violence that not only resulted in Chambers's death but endangered Ms. Fuller as well. On this record we find adequate compliance with Art. 894.1.
The maximum sentence for manslaughter is 40 years at hard labor. La. R.S. 14:31 B. Thomas's 33-year sentence is not out of proportion to the crime and does not shock our sense of justice. This assignment lacks merit.

Thomas's Pro Se Assignments

By his fourth pro se assignment, Thomas urges the district court erred in admitting his statements to police. He contends that because he did not sign a Miranda waiver, no further questioning was allowed, ergo the state failed to prove his statements were freely and voluntarily given.
The state has not responded to this argument.
Prior inconsistent statements are admissible when offered solely to attack the witness's credibility unless the court determines that the probative value of the prior statements is "substantially outweighed by the risks of undue consumption of time, confusion of the issues, or unfair prejudice." La. C.E. art. 607 D(2). Louisiana has long sanctioned the impeachment of a witness in a criminal trial by his prior inconsistent statements. State v. Juniors, supra; State v. Tate, 38,576 (La.App. 2 Cir. 8/18/04), 880 So.2d 255, writ denied, 2004-2554 (La.1/14/05), 889 So.2d 268. The district court committed no error in admitting this evidence. Moreover, before introducing any statement that purports to be a confession, the state must prove that it was "free and voluntary, and not made under the influence of fear, duress, intimidation, menaces, threats, inducements, or promises." La. R.S. 15:451. Aside from his own refusal to sign a Miranda card, Thomas has adduced not one scintilla of evidence that his pretrial statements were not free and voluntary. This assignment lacks merit.
By his second and third assignments of error, Thomas urges ineffective assistance of counsel. He submits a list of alleged legal failings on the part of trial counsel, concluding that these combined to deny him due process. He also contends that the district court erred in refusing to let him serve as cocounsel at trial.
The state has not responded to these assignments.
A defendant is guaranteed the effective assistance of counsel. U.S. Const., amend. 6; La. Const. Art. I, § 13; Strickland v. Washington, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984); State v. Bright, 98-0398 (La.4/11/00), 776 So.2d 1134. To establish a claim of ineffective assistance, a *847 defendant must show that counsel's performance fell below an objective standard of reasonableness under prevailing professional norms; and that counsel's professional errors resulted in prejudice to the extent that it undermined the functioning of the adversarial process and rendered the verdict suspect. Strickland v. Washington, supra; State v. Bright, supra; State v. Greer, 43,177 (La.App. 2 Cir. 4/9/08), 981 So.2d 133, writ denied, XXXX-XXXX (La.12/19/08), 996 So.2d 1132.
We have closely examined each alleged instance of ineffective assistance and find them without merit:
(1) Failure to object to the testimony of state experts Connie Brown and Richard Beighley. Thomas contends that their reports were "never entered into the record" and, without prior discovery, they could not be thoroughly questioned. In point of fact, Mr. Beighley's report was part of a discovery response in May 2006. Ms. Brown's report stated that DNA testing was completed on September 5, 2007; the report was furnished to defense counsel on the first day of trial, September 21, 2007. Thomas has not shown how the state could have disclosed this information any sooner or that defense counsel failed to cross-examine these witnesses adequately.
(2) Failure to file a pretrial motion challenging the admissibility of the Rossi revolver seized from under his grandparents' house, as it was "arguably inadmissible." The gun was found hidden under the house where Thomas was staying, and DNA tests placed him in the 0.3% of the global population who could have handled it. The relevance was overwhelming; there was absolutely no nonfrivolous basis on which to object.
(3) Failure to seek a mistrial when the state tried to introduce the coroner's report, which was not disclosed pretrial. He contends that under La. C. Cr. P. art. 729.5, had counsel so moved, the court would have granted a mistrial. However, this article also provides that the court "may order such party to permit the discovery or inspection," which is precisely what the district court did. Counsel reviewed it in recess and correctly noted that it added nothing to the autopsy report already on file since May 2006. We perceive no error on counsel's part.
(4) Failure to object to certain questions posed to Thomas on cross-examination. However, as noted above, the state was entitled to use his prior inconsistent statements to impeach his claim of self-defense. State v. Juniors, supra; State v. Tate, supra. The objections urged by Thomas would have been inevitably overruled.
(5) Failure to offer Chambers's rap sheet into evidence. Thomas argues that under State v. King, 347 So.2d 1108 (La.1977), his victim's criminal record was relevant to the strategy of self-defense. Even without the rap sheet, however, the evidence already showed that Chambers had fought with Thomas only hours before the shooting, badly cutting his lip; that Chambers sold marijuana from TT's house, where the fight occurred; and that Chambers told at least one person that he wanted to shoot Thomas. There is no showing that the rap sheet would have added anything to the evidence.
(6) Failure to move for a bill of particulars. Thomas makes, however, no showing that the indictment lacked any specifics; it complied with the applicable provisions, La. C. Cr. P. arts. 464, 465 A(32). There is no showing that particulars would have altered the trial in any way.
(7) Failure to call Ms. Fuller as a defense witness, or opting to impeach her only by playing the audiotape of her statement, outside of her presence, instead of *848 directly confronting her with her prior inconsistent statement. At trial, she recalled giving police a statement but not exactly what she said. Counsel's practical expedient of playing the tape was sufficient to establish Ms. Fuller's earlier statement.
These assignments of error lack merit.

Conclusion
We have reviewed the entire record and find nothing we consider to be error patent. La. C. Cr. P. art. 920(2). For the reasons expressed, the conviction and sentence are affirmed.
AFFIRMED.
APPLICATION FOR REHEARING
Before WILLIAMS, CARAWAY, PEATROSS, DREW and MOORE, JJ.
Rehearing denied.